IN RE ESTATE OF GILBERT SYVERSON.

NELS SYVERSON, individually and as coadministrator with will annexed, et al., Appellants, v. ARTHUR SYVERSON, individually and as coadministrator with will annexed, Appellee.

No. 47222.

(Reported in 32 N. W. 2d 799)

June 15, 1948.

Hart & Hart, of Waukon, for appellants.

A. C. Lynch, of Decorah, for appellee.

Bliss, J.—Gilbert Syverson, the testator, was a farmer in Springfield Township, Winneshiek County, Iowa. He died there September 23, 1946, leaving a will executed November 26, 1937, which was probated in said county on October 18, 1946. The sons Nels and Arthur were appointed coadministrators c.t.a., and qualified. Eight children, all adults, survived the testator. The sons are Nels, Willard, Arthur and Melvin, all farmers living near Decorah. The daughters are Alice Numedahl, of Decorah, Clara Hovey, Decorah, R.F.D., Gladys Kitch and Edna Winn, both of Detroit, Michigan.

Testator owned two farms at his death. One of them, the old "home farm" which he acquired in 1896 or before, contained one hundred eighty-eight acres. It was the "home farm" in name and in fact. The testator lived there most of his life, and died there. The children were all born there. The other farm which he owned was always spoken of as the "Sandness farm". He acquired it piecemeal, buying it in portions as he was able. Just when he became the owner of any or all of it does not appear, but the record shows that he owned it for twenty-five or more years. It contained one hundred fifteen acres. On it there was a house, granary, slat corncrib, wire corncrib, and a shed which would shelter about twenty head of cattle. There had never been a resident tenant on this farm during the time the testator owned it. It was about a mile and a half from the home place and was operated in connection with it. It was cropped and pastured. Corn and small grain were raised on it every year. Every year as early as there was pasturage, in April or May, the stock cattle, calves and young cattle, and the

nonmilking cows, were taken to the "Sandness farm" and left there until the late fall. When the pasture was gone and the corn and grain raised on that farm had been fed to the cattle there, and inclement weather had set in, the cattle were taken to the "home farm" to be kept until the next spring. Any unfed grain on the Sandness farm was usually hauled to the home place. Sometimes it was left in the granary or cribs on the Sandness farm.

For twenty years before his death the testator and the defendant, Arthur Syverson, had operated both farms on a "fifty-fifty" basis, that is, each owned half the equipment, half the livestock and half the produce. At the time the testator died all of the farming equipment, livestock, hay, grain etc. were on the "home farm"—the one hundred eighty-eight acres—except nine yearling steers, six yearling heifers, five two-year-old heifers, one steer, twenty-three acres of standing corn, and three hundred fifty bushels of oats, more or less, in the granary, all of which was on the Sandness farm. It is conceded by all parties that when the testator died, he and Arthur each owned an undivided one-half interest in these twenty-one head of cattle, and the corn and oats. In the inventory signed and filed by the co-administrators this property was listed as being on the Sandness farm when the testator died, and an undivided half thereof, valued at $988.50, was stated to be the property of the decedent's estate. It is this property which is in controversy, and which the plaintiffs in their application claim is the property in equal shares of all the children, under the residuary clause of the will, and which the defendant, Arthur Syverson, claims is his property under paragraph 3 of the will.

There is no issue as to the testamentary capacity of the testator, and there is no issue of execution, or undue influence. The dispute is over the disposition of said cattle and grain by the will.

The third, fourth and fifth paragraphs of the will are:

"Third, To my son, Arthur Syverson, I give, devise and bequeath *my home farm* in Springfield Township, Winneshiek County, Iowa, consisting of One Hundred and Eighty (180) acres, more or less, including therewith all livestock, machinery,

grain and other personal property and equipment, *located thereon at the time of my death,* all the said real estate and personal property shall be subject to a payment on the basis of Six Thousand ($6000.00) Dollars into my estate, excepting from said property the following, and that I give and devise to my son, Melvin Syverson, four cows, one team of horses and one set of harness which he shall have the right to choose and remove from the premises immediately after my said Last Will and Testament has been admitted to probate; the said last named property to be the absolute property of my said son, Melvin Syverson. [Italics supplied.]

"Fourth, To my son, Melvin Syverson, I give, devise and bequeath my *other* farm in Springfield Township, Winneshiek County, Iowa, *known as the 'Sandness farm',* consisting of One Hundred and Fifteen (115) acres, more or less, to be subject to a payment of Twenty-five Hundred ($2500.00) Dollars into my estate after which it shall become his absolute property. [Italics supplied.]

"Fifth, that all the rest, residue and remainder of my estate, money and credits of every name and nature, including the monies to be paid as hereinbefore specified by my sons, Arthur Syverson and Melvin Syverson, shall be divided equally, or on an equal basis between all of my children and that I hereby give, devise and bequeath all of said property in equal shares to my daughters and sons, to-wit: [naming them], share and share alike."

No other bequests or devises were made other than to give two shares of creamery-company stock to Arthur, two shares to Melvin, and one share to Willard.

 I. Controversies over the testamentary disposition of property have been the cause of much litigation in both trial and appellate courts. The rules and principles of law involved therein are well settled. The disagreement of the parties in this action involves not the principles, but their application. The primary and controlling consideration in actions of this kind is the determination of the intention of the testator. When that has been done the intention must be made effective if it is a lawful one, and not against public policy. The intention of

the testator must be ascertained from the will itself and from nothing else, if its language is plain and unambiguous. Where the intention is thus clearly and unequivocally expressed there is no need for judicial construction or extrinsic evidence, and all other rules of testamentary interpretation are inapplicable and must yield. The intention must be that which is manifest from the express language of the will or by necessary implication. "The presumption is very strong, however, against his having intended any devise or bequest which he has not set forth in his will." Page, Law of Wills (1901), section 468, page 551. Because of factual dissimilarity the interpretation of the other wills in other cases aids little in ascertaining the intent of the testator in a particular case. Precedents are helpful only in the statement of general principles. We note some of the many decisions of this court announcing rules of law above stated: Fitzpatrick v. Fitzpatrick, 36 Iowa 674, 14 Am. Rep. 538; Smith v. Runnels, 97 Iowa 55, 57, 65 N. W. 1002; Evans v. Hunter, 86 Iowa 413, 414, 415, 53 N. W. 277, 17 L. R. A. 308, 41 Am. St. Rep. 503; Gilmore v. Jenkins, 129 Iowa 686, 691, 692, 106 N. W. 193, 6 Ann. Cas. 1008; In re Estate of Schmitz, 231 Iowa 1178, 1181, 1182, 3 N. W. 2d 512; In re Estate of Thomas, 220 Iowa 50, 54, 261 N. W. 622; Ransom v. Mellor, 230 Iowa 451, 454, 297 N. W. 861; In re Estate of Edwards, 231 Iowa 71, 72, 73, 77, 78, 300 N. W. 673; Creel v. Hammans, 234 Iowa 532, 534, 13 N. W. 2d 305; In re Estate of Austin, 236 Iowa 945, 949, 20 N. W. 2d 445, 162 A. L. R. 709; In re Estate of Flannery, 221 Iowa 265, 270, 271, 264 N. W. 68; Harvey v. Clayton, 206 Iowa 187, 190, 220 N. W. 25; Scofield v. Hadden, 206 Iowa 597, 601, 220 N. W. 1; Jordan v. Hinkle, 111 Iowa 43, 45, 82 N. W. 426; In re Estate of Holdorf, 227 Iowa 977, 984, 289 N. W. 756; Horak v. Stanley, 216 Iowa 318-320, 249 N. W. 166; In re Estate of Pottorff, 216 Iowa 1370, 1372, 1373, 250 N. W. 463; Fulton v. Fulton, 179 Iowa 948, 951, 162 N. W. 253, L. R. A. 1918E, 1080; Canaday v. Baysinger, 170 Iowa 414, 417-420, 152 N. W. 562; Guilford v. Gardner, 180 Iowa 1210, 1221, 162 N. W. 261; Scott v. Scott, 132 Iowa 35, 36, 37, 109 N. W. 293; Moran v. Moran, 104 Iowa 216, 221-223, 73 N. W. 617, 39 L. R. A. 204, 65 Am. St. Rep. 443; Klumpert v. Vrieland, 142 Iowa 434, 436, 121 N.

W. 34; Boehm v. Rohlfs, 224 Iowa 226, 232, 233, 276 N. W. 105; Carpenter v. Lothringer, 224 Iowa 439, 456, 457, 275 N. W. 98; Benham v. Turkle, 173 Iowa 598, 602, 603, 153 N. W. 1017; 69 C. J., Wills, 42, section 1110; In re Estate of Heckmann, 228 Iowa 967, 975, 976, 291 N. W. 465; Starr v. Newman, 225 · Iowa 901, 904, 905, 281 N. W. 830; Anderson v. Anderson, 227 Iowa 25, 31, 32, 286 N. W. 446; Anderson v. Meier, 227 Iowa 38, 42, 287 N. W. 250; Freier v. Longnecker, 227 Iowa 366, 370, 288 N. W. 444; In re Estate of Holdorf, 227 Iowa 977, 984, 985, 289 N. W. 756; In re Will of Hagan, 234 Iowa 1001, 1007, 14 N. W. 2d 638, 152 A. L. R. 1296; In re Estate of Heller, 233 Iowa 1356, 1365, 11 N. W. 2d 586; In re Estate of Johnson, 238 Iowa 1221, 30 N. W. 2d 164, 167; In re Estate of Johnson, 220 Iowa 424, 425, 426, 262 N. W. 811.

Let us apply these rules and principles to the will in this case. In the third paragraph of the will the testator gave Arthur "my home farm", by that designation, and the specified personal property, except what was given to Melvin, *"located thereon at the time of my death."* The words used are all plain, simple, common, and of well-understood meaning. The language is free from uncertainty or equivocation. There are neither patent nor latent ambiguities. The intention of the testator is obviously manifest from the will itself. The only personal property bequeathed to Arthur under the third paragraph was that "located" on the home place at the time of the testator's death. There is nothing unclear or uncertain about the word "located" either generally or as used by the testator. He undoubtedly knew its meaning and used it understandingly. It meant and means that the personal property given to Arthur in item three was limited to that which was placed or on the home farm when the testator died. To say, as Arthur contends, that it meant and was intended to give him "all livestock, machinery, grain and other personal property and equipment" which the testator might own at his death, except what was given to Melvin, is a clear distortion of the meaning and language of paragraph three. It is not construction of the will, but is destruction, by elimination or disregard, of the clause which qualifies and limits the bequest, to wit, "located thereon at the time of my

death." As asked in Anderson v. Wilson, 155 Iowa 415, 419, 136 N. W. 134, 136, Weaver, J., speaking: "Upon what sound principle of construction shall the court say the testator did not mean precisely what he said?" There is no evidence that the testator at any time said or indicated that he had any intention other than that literally expressed by the language he used. Arthur contends that his father did not use the word "located" in its natural, usual, and appropriate sense, but in a "notional", unreal sense, and that the property need not be actually "located" on the home farm, but only there figuratively or in absentia, though in fact and physically it was on the "Sandness farm.". We cannot go so far with Arthur. There is not the slightest evidence or inference that the testator ever had any such notional idea or fancied intention. If he had any such purpose, how simply and readily it could have been effected. In drafting paragraph three of the will, or directing its drafting, he would have said, after devising "my home farm" to Arthur, "including therewith all livestock, machinery, grain and other personal property and equipment which I may own at the time of my death,"—excepting therefrom the cows, horses and harness bequeathed to Melvin.

It is uniformly presumed that the words of the will are used in their natural, usual, popular and conventional meaning. Again quoting from Anderson v. Wilson, supra, at pages 418 and 419 of 155 Iowa, page 135 of 136 N. W.:

"It is a universally accepted rule of the construction of wills that the words of the testator will be given effect according to the approved usage of the language, unless the context or the peculiar circumstances under which the instrument was executed make it reasonably certain that the words were employed by him in some other or more restricted or more enlarged sense."

In Benham v. Turkle, supra, at page 603 of 173 Iowa, page 1018 of 153 N. W., speaking through Gaynor, J., the court said:

"As has been frequently said, words are intended to convey ideas; to convey the thought in one mind to the mind

of another. The wish, the desire, the purpose, of the testator must be gathered from the instrument and attending facts and circumstances, giving to the words their usual and ordinary signification, unless, by the instrument itself, they appear to have been used in a more limited or technical sense.''

To the same effect see Luitjens v. Larson, 222 Iowa 1320, 271 N. W. 239; In re Estate of Johnston, 190 Iowa 679, 683, 180 N. W. 740.

The defendant argues that since the home farm and the Sandness farm were operated together, the testator considered the latter farm as a part of the home farm, and that he intended the bequest in item three to include any personal property that might be on the Sandness farm when he died. He testified that the personal property was assessed at the home farm and was insured there. We see little significance in either matter. Neither would have any material bearing upon the testamentary disposition of the property. It is undisputed that the two farms were always spoken of as the testator designated them in his will. He devised each of them by such respective designations. It was natural and no doubt intentional that he used the designation of ''home farm'' in identifying the personal property bequests to Arthur and to Melvin. He apparently did not wish to give Melvin calves or young cattle or steers, which he knew would very likely be on the Sandness farm, but he wished him to have four milch cows and two horses of his own choosing, and he knew that such livestock were kept on the home place, and he directed him to select them from that farm.

Defendant insists that it was unreasonable for the testator to leave the testamentary disposition of his bounty in any degree or way to chance, and that if he had died in January all of the livestock and grain would have been at the home farm, and Arthur would have received all of it under the will. That would not have been such a catastrophe. He would have received only about $1,000 more than he receives under our determination of this appeal. It is also argued by defendant that if the testator had intended the children other than Melvin and Arthur to have any of the property in controversy he would have made specific bequests to them. He did the more sensible and equitable way.

The residuary legatees, and particularly the daughters in Detroit and Decorah, would probably prefer that the proceeds of the sale of said property be distributed equally among them, than each to receive a steer and a heifer and a hundred bushels of grain.

But whether the testamentary disposition made by the father be regarded as peculiar or proper is quite immaterial under the circumstances. The courts have no authority to interfere therewith. The testator was competent. The property was his to distribute among his children as he pleased. It is not the province of a court to make, remake, or try to improve the will of such a testator. We said in Canaday v. Baysinger, 170 Iowa 414, 417, 418, 152 N. W. 562, 563:

"It is well settled in this state now, and is in other states where the question has been before the courts, that the intention of the testator is controlling. At the time of the making of the will, he is the owner of the property, and has a right under the law to make such disposition of it as he thinks best and desires. The right to dispose of it as he sees fit and to whom he sees fit, has no limitation except that by a will he cannot dispose of those rights given by statute to the widow, and providing the disposition is not immoral or against public policy."

See, also, In re Estate of Heller, supra, 233 Iowa 1356, 1365, 11 N. W. 2d 586; In re Estate of Pottorff, supra, 216 Iowa 1370, 1373, 250 N. W. 463.

It was said by Chief Justice Gibson in Bash v. Bash, 9 Pa. 260, and repeated with approval in Klumpert v. Vrieland, supra, at page 436 of 142 Iowa, page 35 of 121 N. W. "that the courts have no more authority to make wills for the dead than contracts for the living, according to judicial notions of fitness and propriety."

In Guilford v. Gardner, supra, at page 1224 of 180 Iowa, page 266 of 162 N. W., the court said:

"To read this will as applicants would have it read, and totally disregard the condition attached to the devise to Charles E. Gardner, is to destroy, and not to construe. The sole justification and the only purpose of a judicial construction of a will

is the development of the intent of the testator. In so doing, every provision of the instrument, if lawful in character, is to be given due effect. The court may not make a will for the testator, nor impose upon the will a forced or unnatural construction to accomplish what may seem to be a more just or appropriate distribution of his estate."

In Gilmore v. Jenkins, supra, 129 Iowa 686, 692, 693, 106 N. W. 193, 195, 6 Ann. Cas. 1008, we said:

"We have gone as far as any court in permitting extrinsic evidence in aid of the construction of wills, but have never yet held that such evidence is admissible for the purpose of changing a will, or to aid in the making of a new one—one which the testator intended, but did not in fact make. * * * Courts are justified in some cases in changing the language of a will; in discarding words where they appear to be without meaning; in supplying and transposing words and sentences, and even paragraphs. * * * But this rule is always subject to the primary one that a court cannot correct a mistake in a will, or make a new will for the parties. * * * No doubt a mistake was made by the scrivener in drafting this will, but it is such an one as courts are powerless to correct."

And in Moran v. Moran, supra, 104 Iowa 216, 222, 73 N. W. 617, 619, 39 L. R. A. 204, 65 Am. St. Rep. 443, the court said:

"From an extended examination of authorities, we are led to regard the rule as universal that the plain effect of the language as used in the will is not to be varied by external proof of what effect was really intended."

See, also, Page, Law of Wills (1901), section 444.

Under the law and the facts it is our conclusion that by the clear and definite language in the third paragraph of the will the testator did not intend therein to bequeath to the defendant any part of the personal property in controversy.

II. In attempting to sustain his contention that the property in controversy was bequeathed to him under the third paragraph of the will, defendant argued that if it were not

so it would be intestate property, since, by the rule of ejusdem generis, it was excluded from the residuary bequest in the fifth paragraph of the will. That rule, like other testamentary rules of construction, has no application where the intention of the testator is manifested by the will itself. In Wallace v. Homestead Co., 117 Iowa 348, 354, 355, 90 N. W. 835, 837, the court, speaking of the rule, said:

"* * * according to which general words following words of a more particular character are regarded as limited in their meaning by the former. This rule is, however, as are practically all the rules of construction, subordinate to the requirement that the intent of the parties is to be chiefly sought, and will, of course, not apply if the intent appears to be otherwise. General words preceding other words that are particular in meaning are likewise on the same principle limited by the particular words, unless the intention appears to be otherwise. 17 Am. & Eng. Enc. of Law (2d Ed.) pp. 4, 6, and cases cited."

"The rules that have been adopted for the construction of wills are useful, and only useful, when they aid in the ascertainment of the intent of the testator." Benham v. Turkle, supra, 173 Iowa 598, 603, 153 N. W. 1017, 1018.

See, also, In re Estate of Flannery, supra, 221 Iowa 265, 271, 264 N. W. 68; In re Estate of Pottorff, supra, 216 Iowa 1370, 1373, 250 N. W. 463.

" 'In determining the testamentary intention, we must look only to the will. Rules of law may aid in discovering it, but they do not control or defeat it.' In re Moran's Will, 118 Wis. 177 (96 N. W. 367)." Williamson v. Youngs, 200 Iowa 672, 675, 203 N. W. 28, 29.

See, also, Scofield v. Hadden, supra, 206 Iowa 597, 601, 220 N. W. 1.

"In order to avoid partial intestacy, the general rule is that a residuary clause should be liberally construed. * * * A residuary clause passes not only all the property which the testator did not attempt to dispose of, but also, as a general rule, all the property which he attempted to dispose of but of

which his disposition has for any reason failed." Page, Law of Wills, supra, section 507, page 594, and cases cited.

We are not called upon in this case to approve or to pass upon such rules.

 But we have held repeatedly that where it can fairly be done, a construction will be avoided that results in intestacy. Creel v. Hammans, supra, 234 Iowa 532, 534, 13 N. W. 2d 305; Busby v. Busby, 137 Iowa 57, 61, 114 N. W. 559; Horak v. Stanley, supra, 216 Iowa 318, 319, 249 N. W. 166. Under ordinary circumstances a person makes a will to dispose of his entire estate, and if it is susceptible of two constructions, by one of which but part of the estate is disposed of, and by the other the entire estate, courts prefer the latter construction if it is reasonable and consistent with the will as a whole.

In this case the matter is of no practical importance since the property involved will pass to all of the children in equal shares whether by intestacy or by residuary clause.

III. We find no merit in plaintiffs' contention that defendant estopped himself by his conduct. However, in Guilford v. Gardner, supra, 180 Iowa 1210, 1222, 1223, 162 N. W. 261, conduct of the parties was mentioned as a practical construction of the will.

Considering the entire will it is our conclusion that the testator intended the property in controversy to pass by the residuary, or fifth, clause of the will.

There are no disputed questions of fact on any controlling question involved. The controversy has been as to the application of the law to the facts. The case has been well presented and tried—there is little likelihood of any additional evidence available. It does not appear that the ends of justice would be served by a new trial. The judgment and decree is therefore reversed and the cause is remanded to the district court with directions to enter judgment and decree not inconsistent herewith.—Reversed and remanded.

OLIVER, HALE, GARFIELD, WENNERSTRUM, and HAYS, JJ., concur.

SMITH, J., and MULRONEY, C. J., and MANTZ, J., dissent.

SMITH, J. (dissenting)—I am unable to agree with the majority opinion. It seems either to treat the case as triable de novo on appeal or to consider the trial court's findings as legal conclusions upon which error may be predicated. I would affirm on the ground that the decision is based on findings of fact, supported by sufficient competent evidence, and is not reviewable.

I. It is to be observed first the case arose in probate and if it be thought the pleading by appellees presented an equitable issue, no motion to transfer was made and it was tried as a proceeding at law.

II. I have no quarrel with the *general* rules of interpretation announced by the majority and so formidably supported by citation of cases. Those rules are too well settled to require such wholesale citation. They relate to the construction of the *language* of the instrument in case of ambiguity appearing on its face, that is, to cases of patent ambiguity.

In the construction of such wills the process of applying the rules is purely legal and if the trial court does not properly act an error of law results which is clearly reviewable, whether the trial be at law or in equity. It is always the function of the court to construe ambiguous language of a written instrument.

III. The case here is of quite different character. The language of the will is clear and unambiguous. But when the circumstances are shown it becomes apparent some of testator's words, describing certain personalty, should not be literally construed.

The distinction between patent and latent ambiguity is of course recognized in our cases. See, e. g., Boehm v. Rohlfs, 224 Iowa 226, 233, 276 N. W. 105; Fitzpatrick v. Fitzpatrick, 36 Iowa 674, 14 Am. Rep. 538; and In re Estate of Lepley, 235 Iowa 664, 670, 17 N. W. 2d 526, 529. In the Lepley case we said:

"A latent ambiguity exists where the language of the instrument does not lack certainty but some extrinsic or collateral matter outside the will renders the meaning obscure and uncertain. * * * With no ambiguity apparent on the face of the will, we will give it its legal construction and this will

control *unless the testimony* shows some latent or hidden ambiguity." (Italics supplied.)

In Fitzpatrick v. Fitzpatrick, supra, there is a thorough discussion of the subject and review of cases to that date. The opinion then says (page 683):

"These cases, and many more that could be cited, proceed upon the doctrine that where a latent ambiguity is discovered, evidence of extrinsic *facts* may be admitted in aid of the exposition of the will; to determine whether the *words of the will*, with reference to the facts, admit of a plain application, and if not, then to determine whether the *words* can be applied in any other sense of which they are capable, so as to satisfy the intention of the testator."

The rules of construction in this latter class of cases are just as well settled as are those labored by the majority opinion. In both the end sought is the intent of the testator. That intent, when ascertained, must control. But in case of latent ambiguity the apparently clear language of the instrument does not necessarily control.

And in cases of this kind the court determines the intent as a fact and not a law question. The supreme court of Minnesota has expressed it thus:

"Where the trial court makes its findings and conclusions, based on extrinsic facts in addition to the will, there is apparently no reason why its findings and conclusions should not have the same weight as in any other case. In re Paulson's Will, 127 Wis. 612, 107 N. W. 484, 5 L. R. A. (N. S.) 804, 7 Ann. Cas. 652. We are called upon here to review such findings and conclusions. Such findings are not to be set aside if reasonably sustained by a consideration of all the evidence. This rule applies to inferences and conclusions from undisputed facts, as well as to findings on conflicting evidence. Such inferences and conclusions are treated as findings of fact and not to be disturbed unless contrary to the inferences a reasonable mind might properly draw from the evidence. Northwestern F. & M. Ins. Co. v. Connecticut Fire Ins. Co., 105 Minn. 483, 117 N. W. 825; Great Northern Ry. Co. v. City of Minneapolis, 142 Minn. 308,

172 N. W. 135. Under these rules we cannot say that the evidence is insufficient to sustain the findings and conclusions of the trial court." In re Estate of Kelly, 177 Minn. 311, 315, 225 N. W. 156, 157, 67 A. L. R. 1268.

To the same effect is the language in In re Will of Mitchell, 157 Wis. 327, 330, 147 N. W. 332, 333:

"The trial court in determining the precise meaning intended by a testator in using a particular expression deals with matter of fact to be solved from evidentiary inferences and, in case of a result being reached consistent with correct principles of law, the rule applies on appeal that such result will not be disturbed unless clearly wrong.

"The trial court, in this case, reached the result complained of by weighing the evidentiary inferences arising from the whole will and its characterizing circumstances according to the foregoing principles. No clear indication of error in respect thereto appears. Therefore: The judgment is affirmed."

The doctrine is not new. The New York court said many years ago in a will construction case:

"So, too, if a devise or bequest is equivocal either as to the subject or the object, and the meaning of the testator cannot be ascertained by a construction of the will with the aids allowed by law, and the intent of the testator, as proved by extrinsic evidence, alone gives direction to and controls the gift, the intent may be a question of fact which this court could not review." St. Luke's Home for Indigent Christian Females v. An Association for the Relief of Respectable Aged Indigent Females, 52 N. Y. 191, 199, 11 Am. Rep. 697, 703.

IV. I am convinced by this record that Mr. Syverson, when he drew this will, had no intention of having it operate by the chance circumstances of the technical location of the property at the instant of his death. The will was drawn in 1937. He died almost nine years later. The two farms were operated (by testator and appellee) as a unit during all that time and had been so operated many years before. No one lived or had ever lived on the Sandness farm during testator's ownership of it. Any property "located" on it was there temporarily only.

The will gives the son Melvin the Sandness farm but mentions no property located on it, although he is given "four cows, one team of horses and one set of harness", of the property which is described as located on the home farm.

Testator apparently considered the home farm as the situs of all the personal property concerned in the joint farming operations that involved the two farms as a unit. Had he considered the Sandness farm as the situs of any of such property he would have made some disposition of it. This he did not do even in the residuary clause. The conclusion seems inescapable that he did not consider any personal property as located on the Sandness place.

However it is not our duty to weigh the evidence, except so far as necessary to determine whether it is sufficient to support the trial court's finding of fact. Whether we would have reached the same conclusion is wholly immaterial.

V. Testator died September 23, 1946. The property in dispute includes one-half interest in twenty-three acres of standing corn on the Sandness farm. It would seem it must have been a part of the real estate and should be held to have passed to Melvin under the devise to him of the Sandness farm.

I would favor modification of the trial court's judgment as to this item and would affirm it as so modified.

MULRONEY, C. J., and MANTZ, J., join in this dissent.